UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

RAMON MARIA AQUINO,

                               Plaintiff,

       -against-

COMMISSIONER OF SOCIAL SECURITY,

                               Defendant.

-----------------------------------------------------------------X

21-CV-10125 (SN)

**OPINION & ORDER**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/22/2023

**SARAH NETBURN, United States Magistrate Judge:**

Ramon Maria Aquino seeks review of the decision of the Commissioner of Social Security (the "Commissioner") finding that he was not disabled under the Social Security Act (the "Act"). The parties have cross-moved for judgment on the pleadings. The Commissioner's motion is DENIED, and Aquino's motion is GRANTED.

## BACKGROUND

### I. Administrative History

Aquino applied for Disability Insurance Benefits ("DIB") on August 24, 2018. See ECF No. 12 Administrative Record ("R.") 188. He alleged disability beginning August 23, 2018, due to narcolepsy and chronic back pain. R. 43-44. On December 18, 2018, his application was denied, and he requested a hearing before an administrative law judge ("ALJ") to review his case. R. 51. Aquino appeared *pro se* for a video hearing before ALJ Sandra DiMaggio Wallis on September 26, 2019, who issued a decision denying Aquino's claim on December 5, 2019. R. 56-63. Plaintiff then requested review by the Appeals Council, and on October 26, 2020, the Appeals Council remanded his case for a new hearing. R. 135, 68-70.

On January 15, 2021, Aquino appeared *pro se* for a telephone hearing before ALJ Vincent M. Cascio, who issued a decision denying Aquino's claim on April 7, 2021. R. 23-34. On September 24, 2021, the Appeals Council denied Aquino's request for review, making the ALJ's decision final. R. 1-7; see 20 C.F.R. § 404.981; 42 U.S.C. § 405(g).

## II.    Aquino's Civil Case

Aquino filed his complaint on November 29, 2021, seeking review of the ALJ's decision. See ECF No. 1. He requested that the Court either set aside the decision and grant him DIB or remand the case for further proceedings, and that he be awarded attorney's fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412. Id. at 2. The Commissioner answered by filing the administrative record, and the parties cross-moved for judgment on the pleadings. See ECF Nos. 12, 13, 17.

The Honorable Lorna G. Schofield referred this case to my docket and the parties consented to my jurisdiction on July 14, 2022, pursuant to 28 U.S.C. § 636(c). ECF Nos. 9, 16.

## III.    Factual Background

Upon a thorough review of the pleadings and administrative record, the Court identified two issues related to Aquino's narcolepsy that it believed were not adequately briefed by either party. A hearing was held on February 10, 2023, to discuss:

> whether at step three the ALJ erred in his analysis of the objective medical evidence by rigidly applying the factors of listing 11.02 without adequately considering the ways narcolepsy differs from epilepsy, as illustrated by Program Operations Manual System DI 24580.005; and whether in assessing Plaintiff's RFC the ALJ erred by discrediting Plaintiff's testimony about the intensity, persistence, and limiting effects of his narcolepsy-related symptoms, after failing to consider more recent medical record evidence demonstrating that Plaintiff's symptoms were no longer effectively managed by medication?

ECF No. 20, 23. The Court finds these two issues to be dispositive, and thus this summary, and the analysis that follows, focuses exclusively on them.

A.     **Non-Medical Evidence**

Aquino was born in 1977. R. 191. He completed high school and, before his alleged onset of disability, worked as a cable television line technician for 16 years. R. 560, 32, 594.

In October 2017, Aquino was laid off. R. 594-95. He decided to attend college but found it difficult to focus and retain information, leading him to believe he might be suffering from attention deficit hyperactivity disorder ("ADHD"). R. 595. In June of 2018, he sought out treatment with eRiver Neurology, where, after reporting a history of "fall[ing] asleep any time of day without provocation, even in the morning," he was referred for a polysomnogram and multiple sleep latency test ("MSLT"). R. 300-02. These tests resulted in a diagnosis of narcolepsy. R. 305, 439, 444.

At his first hearing, Aquino testified that his condition resulted in exhaustion in addition to sleeping throughout the day, telling the ALJ "I'm always tired. Being home, I do nap. . . . if I'm not occupied, I'm sleeping." R. 567. He recounted that following his diagnosis "[a] lot of things start[ed] making sense," and that he believes he has had narcolepsy since he was a child. R. 568. When he worked as a cable technician, he once fell asleep behind the wheel of his car while stuck in traffic. R. 569. He reported sleeping at work daily, drinking "coffee like no tomorrow," consuming Five-Hour Energy drinks, and smoking cigarettes any time he felt tired. R. 570. After being laid off, Aquino attempted to drive for Lyft, but stopped because he did not feel comfortable driving with others in the car. R. 571. He reported that he now drives "[v]ery sparingly" and only "to my wife's job, which is two minutes away from my house and back. That's it. I don't go anywhere. We don't do anything." Id.

At his second hearing, Aquino again explained that he believed he had always suffered from narcolepsy but had compensated for his symptoms by sleeping at work, smoking cigarettes,

3

and consuming energy drinks. R. 595, 603. Despite receiving ongoing treatment for his narcolepsy, Aquino recounted a need to nap several times a day and being able to stay awake for only a few hours at a time. R. 598-99, 601-02. He testified that he was on "the highest dose" recommended for his current medication, modafinil, but that "it doesn't really give me a lot of— I don't have long periods of energy." R. 598. Aquino reported that he wakes around 6:30 a.m., but even with medication is able to stay awake only until around 10:00 a.m. before needing to nap for one or two hours. Id. He stated that he would then be "good for about two hours [before needing] to lay down again, and then I'll take another nap. It's frustrating and it's annoying." Id.

Aquino testified that he had tried other medications to no avail, and that increased dosage of modafinil had the potential of causing cardiac issues. R. 599. He testified to being able to do housework and supervise his children while they attended school online and explained to the ALJ that he is "not incapable . . . . That's not the issue. The issue is, it's in spurts." R. 601-02. Aquino then agreed with the ALJ's observation that "it's really your persistence that's an issue, correct?" R. 602.

The ALJ asked the vocational expert whether possible jobs existed in the national economy for a person who can perform a full range of work with certain nonexertional limitations. Although jobs existed, the vocational expert confirmed that no jobs existed if the person would be off task 15% of the workday. R. 605-06.

### B. Medical Records

On July 24, 2018, Aquino underwent a polysomnogram, commonly referred to as a sleep study. R. 438. The study "revealed a reduced sleep efficiency, long primary sleep latency, short REM latency, and long slow wave latency" and yielded a diagnosis of an unspecified sleep disorder. R. 439. The next day, Aquino underwent an MSLT, during which five naps were

attempted. R. 444. Aquino fell asleep during all five attempts, with a mean sleep latency[1] of just over two minutes and achieving REM sleep in three out of five naps in four minutes or less. 444-45. These results were diagnostic for narcolepsy and pathologic sleepiness. R. 444.

At a follow-up appointment at eRiver Neurology with Kathryn McDonnell, NP on August 23, 2018, Aquino was prescribed "modafinil 200 mg daily in the morning, one hour prior to leaving the house." R. 305. Aquino was "asked to refrain from driving, operating heavy equipment, climbing or working from heights." Id. Notes from his next visit on September 10, 2018, state that "Provigil[2] has been repeatedly denie[d] by insurance company. Ritalin (methylphenidate) is formulary and prescribed at a starting does of 5 mg." R. 308. The notes also indicate that Aquino drives on a limited basis. Id.

Notes from Aquino's next visit on October 18, 2018, indicate that "Ritalin did not reduce excessive sleepiness. Provigil has since been authorized . . . . 100 mg daily was started 10/5/2018." R. 419. His dosage was doubled on October 25, 2018, and notes from a December 10 visit report that "spontaneous daytime sleep episodes have been significantly reduced, none since Provigil increase. He can work at the computer without falling asleep. . . . Does not require OTC stimulants or excessive caffeine to remain awake in the afternoon although he notices increased daytime fatigue during the afternoon." R. 417. Visit notes from January 8, 2018, indicate that Aquino "[c]ontinues to experience general fatigue." R. 414. Notes from his next appointment on April 12, 2018, indicate that his dosage was increased again to 300mg daily, and that he is subsequently "experiencing less afternoon sleepiness on the increased dose" with "[n]o unplanned or spontaneous sleep periods." R. 411-12. Notes from a July 9, 2019 visit reflect similar management of Aquino's symptoms. R. 532.

---

[1] The time between "lights out" and "sleep onset."
[2] A brand name for modafinil.

On October 9, 2019, Aquino reported that he "[t]ires in the afternoon" and was "experience[ing] increased difficulty focusing and sustaining concentration" but continued to have no unplanned sleep episodes. R. 535. On February 3, 2020, he reported "diminished periods of wakefulness after taking Provigil" and "[r]educed ability to focus and maintain concentration" and that while "[i]n the past he was able to maintain a sustained period of wakefulness for at least four hours, that has been reduced to about two hours following Provigil administration." R. 537. McDonnell noted that "[d]osages greater than 200 mg daily rarely provide increased efficacy" and that "Sunosi 75 mg daily may offer a prolonged period of daytime wakefulness." R. 538. On May 5, 2020, Aquino was proscribed Sunosi to take alongside his 300mg dose of Provigil. R. 541.

By July 6, 2020, Aquino reported "increased fatigue [and] moodswings" since beginning the Sunosi, and that he had "not appreciated any increased periods of sustained wakefulness." R. 545. Aquino continued "to report difficulty completing tasks throughout the day due to excessive sleepiness, more so in the afternoon." Id. McDonnell discontinued the Sunosi and proposed the addition of Concerta, a long-acting stimulant, but noted that this would require clearance from a cardiologist. R. 545-46. Notes from August 18, 2020, indicate that Provigil continued to have "limited efficacy for about two hours after administration," and that Aquino had reported a sudden sleep event in the morning. R. 547. McDonnell also noted that Aquino "drives very locally when peak effect of Provigil is experienced." R. 547. McDonnell's final note in the record from January 21, 2021, indicates a similar lack of symptom management by Provigil and that cardiological clearance was still pending. R. 549.

C.	**Medical Opinions**

1.	**Alex Gindes, PhD**

On December 4, 2018, Aquino was examined by psychologist Dr. Gindes. R. 340-44. Dr. Gindes noted that Aquino "seems to be chronically fatigued which may be associated with his narcolepsy," and that he "evidenced significant problems with attention and concentration." R. 341. Aquino "had difficulties with simple calculations and performed serial 7s by 1s with great difficulty." R. 342. Dr. Gindes found Aquino's memory to be mildly impaired, but his cognitive functioning, insight, and judgment were all normal. Id. Dr. Gindes ultimately recommended that Aquino be evaluated for ADHD. R. 343.

2.	**Trevor Litchmore, M.D.**

On October 23, 2018, Aquino was examined by Dr. Litchmore, an internal medicine doctor. Dr. Litchmore noted Aquino's narcolepsy diagnosis and concluded that he will have "limitations as it relates to activities that preclude a diagnosis of obstructive sleep apnea." R. 329.

IV.	**The ALJ's Decision**

On April 7, 2021, the ALJ denied Aquino's DIB application. R. 20-34. The ALJ identified the administrative and procedural history, the applicable law, and his findings of fact and conclusions of law. Id.

At Step One, the ALJ determined Aquino had not engaged in any substantial gainful activity since his alleged onset date, August 23, 2018. R. 26. At Step Two, he found that Aquino had two severe impairments: narcolepsy and adjustment disorder. Id. At Step Three, he determined that neither of Aquino's impairments, individually or in concert, met or medically equaled the severity of a listed impairment in the applicable regulations. R. 27; see 20 C.F.R.

7

404.1520(d), 404.1525, 404.1526. Specifically, the ALJ found the requirements of listing 11.02 (epilepsy), 12.04 (depressive, bipolar, and related disorders), and 12.06 (anxiety and obsessive-compulsive disorders) were not met. R. 27.

The ALJ established Aquino's residual functional capacity ("RFC"). Id. He found that Aquino possessed the RFC to perform a full range of work at all exertional levels, but with non-exertional limitations of avoiding climbing ladders, ropes, and scaffolds, and avoiding exposure to unprotected heights and hazardous machinery. R. 29. At Step Four, the ALJ determined Aquino was unable to perform his past relevant work as a cable television line technician. R. 32.

At Step Five, the ALJ concluded that there were jobs existing in significant numbers in the national economy that Aquino could perform. Id. Accordingly, the ALJ found that Aquino was not disabled, as defined by the Social Security Act, between his alleged disability onset date and the date of the decision. R. 33.

## DISCUSSION

### I. Standard of Review

In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). An ALJ's determination may be set aside only if it is based upon legal error, or it is not supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998)).

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The

Commissioner's findings as to any fact supported by substantial evidence are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995); see also Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."). Therefore, if sufficient evidence supports the ALJ's final decision, the Court must grant judgment in favor of the Commissioner, even if substantial evidence also supports the plaintiff's position. See Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." (emphasis in original) (citations and internal quotation marks omitted)). Although deferential to an ALJ's findings, a disability determination must be reversed or remanded if it contains legal error or is not supported by "substantial evidence." See Rosa, 168 F.3d at 77.

## II.  Definition of Disability

A claimant is disabled under the Act if they demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. § 1382c(a)(3)(D). A claimant will be found to be disabled only if their "impairments are of such severity that [they are] not only unable to do [their] previous work but cannot, considering [their] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . ." Id. § 1382c(a)(3)(B).

An ALJ must proceed through a five-step process to make a disability determination. See 20 C.F.R. § 404.1520. The steps are followed in order; if it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. See id. The Court of Appeals has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (quoting Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1999)).

A claimant bears the burden of proof as to steps one, two, three, and four; the Commissioner bears the burden as to step five. Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013).

## III. Analysis

### A. The ALJ's Step Three Analysis

Narcolepsy is a not a listed impairment in the Social Security Act, but the Social Security Administration's ("SSA") Programs Operations Manual System ("POMS") directs that it be evaluated under 11.02, the listing for epilepsy. POMS DI 23580.005, *Evaluation of Narcolepsy*, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424580005 ("Although narcolepsy and epilepsy are not truly comparable illnesses, when evaluating medical severity, the closest listing to equate narcolepsy with is Listing 11.02, Epilepsy.").

Listing 11.02 is met where a claimant, despite adherence to prescribed treatment, suffers from one of two types of seizures at specified frequencies. 20 C.F.R. pt. 404, subpt. P, app. 1, § 11.02A, B.

Regarding the distinction between narcolepsy and epilepsy, the POMS provides the following guidance: "[t]here are no physical abnormalities in narcolepsy . . . laboratory studies will be normal" and "[i]t is not necessary to obtain an electroencephalogram (EEG) in narcolepsy cases. A routine EEG is usually normal . . . ." POMS DI 23580.005. Regarding the evaluation of narcolepsy itself, the POMS state that its severity "should be evaluated after a period of 3 months of prescribed treatment" and "it is important to obtain from an ongoing treatment source a description of the medications used and the response to the medication, as well as an adequate description of the claimant's alleged narcoleptic attacks . . . ." Id.

The Act itself states that if a claimant has "a severe medically determinable impairment that does not meet a listing, the SSA will determine whether that impairment medically equals a listing." 20 C.F.R. pt. 404, subpt. P, app. 1, § 111.00R1 (cleaned up). Medical equivalence is defined as an impairment that is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404.1526(a). For impairments that are entirely unlisted, like narcolepsy, the Act states that they will be compared to the listings for "closely analogous listed impairments" and that "[i]f the findings related to your impairment(s) are at least of equal medical significance to those of a listed impairment, we will find [them] medically equivalent to the analogous listing." Id. at (b)(1)(B)(3). The Act further explains that the SSA, "[i]n considering whether your symptoms, signs, and laboratory findings are medically equal to [those] of a listed impairment, [] will look to see whether [they] are at least equal in severity to the listed criteria." 20 C.F.R. § 404.1529(d)(3).

"[A]n ALJ should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment," but "the absence of an express rationale" does not warrant remand if a reviewing court is "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence." Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112 (2d Cir. 2010) (internal quotation marks omitted).

Here, the ALJ correctly analyzed Aquino's symptoms under Listing 11.02 but did so in a cursory and rigid manner that failed to acknowledge *any* distinction between narcolepsy and epilepsy. R. 27. For example, the ALJ noted that the medical evidence showed no syncope (fainting), but syncope is not a symptom of narcolepsy.[3] He noted that Aquino "showed normal coordination and sensation" and "underwent an [EEG] that showed no lateralized or epileptic activity" even though neither of these findings is preclusive of or even relevant to narcolepsy. R. 27; see POMS DI 23580.005 ("[t]here are no physical abnormalities in narcolepsy" and "[a] routine EEG is usually normal"). The ALJ also erroneously stated that Aquino "underwent a normal polysomnogram" despite the results of that test yielding a diagnosis of "Sleep Disorder; Unspecified." R. 27, 439.

In essence, the ALJ failed to conduct a medical equivalence analysis of Aquino's narcolepsy as required by the Act. The Court, therefore, is unable to meaningfully evaluate the ALJ's decision at Step Three. See Santiago Ortiz v. Comm'r of Soc. Sec., No. 19-cv-0538 (MWP), 2020 WL 5792968, at *5 (W.D.N.Y. Sept. 29, 2020) (finding reversible error and gathering cases where ALJs found no impairment under 11.02 because of a lack of seizures, despite claimants possessing a migraine impairment (which, like narcolepsy, is also unlisted and analyzed under 11.02)).

---

[3] There is also no mention of syncope in Listing 11.02.

While the wholesale omission of the medical equivalence analysis does not *per se* warrant remand, the Court cannot find clear support for the ALJ's conclusion elsewhere in the opinion or in the record itself. Throughout the opinion the ALJ refers to Aquino's physical ability to complete certain tasks, such as driving or caring for his children, fundamentally misunderstanding the nature of Aquino's condition. Aquino himself ably framed the issue in a letter to the Appeals Council following his first hearing. R. 281 ("I am not claiming a physical disability and the statements suggesting I can perform basic everyday activities do not indicate the nap I have to take every 3 to 4 hours."); see also R. 598 (Aquino testifying that he wakes at 6:30 but "[b]y 10:00 – and that's the feeling I get, so I have to lay down. And it's like that in spurts. I'll wake up in like another hour, maybe two hours, and I'm good for about two hours. And then it's like, okay, I got to lay down again, and then I'll take another nap.").

Additionally, the ALJ noted that Aquino reported improvement in his symptoms with medication and cited to a December 2018 medical record. R. 417. But later records plainly demonstrate that after a brief period where the medication was effective, Aquino reverted to needing to nap for several hours throughout the day. R. 541 (05/04/2020 examination notes: Provigil 300mg daily "no longer getting sustained effect"); R. 545 (07/06/2020 examination notes: Sunosi 75mg daily with Provigil 300mg daily not providing "any increased periods of sustained wakefulness. He continues to report difficulty completing tasks throughout the day due to excessive sleepiness, more so in the afternoon."); R. 547 (08/18/2020 examination notes: Provigil 300mg daily "has limited efficacy for about 2 hours after administration"); R. 549 (01/21/2021 examination notes: Provigil 300mg daily "has limited efficacy and provides a sustain effect for 2-3 hours after administration"). The ALJ appears to have ignored these later records.

Aquino's medical records are also uncontradicted by the consulting examiners or by any other portion of the record. Indeed, Dr. Litchmore concluded that Aquino would have limitations due to his sleep issues, and the ALJ found his opinion "persuasive." R. 30.

On remand the ALJ is directed to conduct a proper medical equivalence analysis as required by the Act, with the understanding that narcolepsy and epilepsy are wholly unrelated conditions. The ALJ must evaluate narcolepsy as a "chronic neurological disorder characterized by recurrent periods of an irresistible urge to sleep" accompanied by other events, including sleep paralysis. See POMS DI 23580.005. Because "[t]here are no physical abnormalities in narcolepsy" and a "routine EEG is usually normal," id., the absence of "abnormal findings," R. 27, is not relevant and may not be a basis for finding no disability. The ALJ is directed to review the entirety of the record, particularly those parts that were previously misread or omitted entirely. The ALJ's decision must be supported by substantial evidence.

### B.     The ALJ's RFC Determination and Evaluation of Aquino's Testimony

It is the ALJ's role to evaluate a claimant's credibility and to decide whether to discredit a claimant's subjective estimate of the degree of his impairment. Tejada, 167 F.3d at 775-76; see also 20 C.F.R. § 404.1529(c) (an individual's subjective complaints alone do not constitute conclusive evidence of a disability). In making a credibility determination, if a claimant alleges symptoms of greater severity than established by the objective medical findings, "[t]he ALJ's decision must 'contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight.'" Watson v. Berryhill, 732 F. App'x 48, 52 (2d Cir. 2018) (quoting SSR 96-7p, 1996 WL 374186, at *2). "[C]ourts must 'defer to an ALJ's decision to discredit subjective

complaints if the decision is supported by substantial evidence.'" Dorta v. Saul, 19-cv-2215 (JGK)(RWL), 2020 WL 6269833, at *8 (S.D.N.Y. October 26, 2020) (quoting Watson).

When the ALJ assesses a claimant's alleged disability, they, "unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009); Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (confirming that the ALJ has an affirmative duty to develop the record, which "arises from the Commissioner's regulatory obligations to develop a complete medical record before making a disability determination"); see also 42 U.S.C. § 423(d)(5)(b), 20 C.F.R. § 404.1512(d). The Court, in turn, must make a "searching investigation of the record" to ensure that the claimant received "a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." Hankerson v. Harris, 636 F.2d 893, 895 (2d Cir. 1980) (internal quotation marks omitted). When the ALJ has failed to develop the record adequately, the Court must remand to the Commissioner for further development. See, e.g., Pratts, 94 F.3d at 39.

Where a claimant is unrepresented, "compliance with the minimum requirements of the regulations is not always sufficient to satisfy the ALJ's heightened duty to develop the record." Williams v. Barnhart, No. 05-cv-7503 (JCF), 2007 WL 924207, at *7 (S.D.N.Y. March 27, 2007) (collecting cases); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990) ("[W]hen the claimant is unrepresented, the ALJ is under a heightened duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." (internal quotation marks omitted)).

"The failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." Ceballos v. Bowen, 649 F. Supp. 693, 702 (S.D.N.Y. 1986) (citing Valente v. Secretary of HHS, 733 F.2d 1037, 1045 (2d Cir. 1984)). "Although the ALJ is not required to reconcile

explicitly every conflicting shred of medical testimony, [they] cannot pick and choose evidence in the record that supports [their] conclusions." Rivera v. Sullivan, 771 F. Supp. 1339, 1354 (S.D.N.Y. 1991) (internal citations and quotation marks omitted).

Here, the ALJ found that Aquino's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" and ultimately concluded that he possessed the RFC to work at all exertional levels. R. 29-30. Critically, the ALJ found that Aquino "reported feeling well and an ability to stay awake after an increase in his medication." R. 30, 31. However, this finding is unsupported by the medical record evidence, which shows a clear deterioration in Aquino's symptom management over time that required regular increases in his modafinil dosage. Once Aquino reached the maximum dose recommended by his provider, his symptoms nearly returned to baseline with the medication having "limited efficacy for about two hours after administration." R. 547. When discussing the effect that medication had on Aquino's narcolepsy symptoms, the ALJ cited to medical records from February and April of 2019, R. 30, 31, 355, 529, but offered no explanation for ignoring later portions of the record, beginning in February 2020 through January 2021, when medication became ineffective. R. 537, 549.

Of concern, the ALJ repeatedly stated that Aquino "received medication to take once a day in the morning, and one hour prior to driving." R. 29, 30, 31. In support, the ALJ cited to treatment notes from August 23, 2018. Those notes actually state that Aquino was prescribed modafinil to take "daily in the morning, one hour prior to leaving the house," and that "[a]t this time *he is asked to refrain from driving*, operating heavy equipment, climbing or working from heights." R. 305 (emphasis supplied). The ALJ's selective reporting of this record raises serious questions about whether the ALJ adequately developed the record.

16

The ALJ's decision to discredit Aquino's testimony regarding his narcolepsy symptoms was reached only after ignoring more recent medical records and cherry-picking statements out of context. The ALJ's failure to acknowledge the relevant evidence in the record, or explain its rejection, constitutes legal error. Ceballos, 649 F. Supp. at 702. And given Aquino's *pro se* status when appearing before him, the ALJ's failure to "probe into, inquire of, and explore for all the relevant facts" by both ignoring portions of the record and erroneously reading others, is also error. Cruz, 912 F.2d at 11.

On remand the ALJ is again directed to review the entirety of the record and consider Aquino's documented need to sleep multiple times throughout the day when conducting the RFC analysis. See also R. 606 (vocational expert testifying that no jobs exist in the national economy if Aquino were to be off task 15% of a workday, meaning asleep slightly more than an hour a day).

## CONCLUSION

The Commissioner's motion is DENIED, and Aquino's motion is GRANTED. The case is remanded to the Social Security Administration for further proceedings consistent with this opinion. The Clerk of Court is respectfully requested to terminate the motions at ECF Nos. 13 and 17.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

DATED:   February 22, 2023
         New York, New York